## ALLIANCE SECURITIES CO. v. J. A. MOHR & SON.

### SAME v. STANDARD OIL CO.

(District Court, N. D. California, S. D. November 25, 1925.)

Nos. 1280, 1299.

**1. Patents ⬤328.**

Hopkins patent, No. 1,196,691, covering device for atomizing and spraying liquids on surfaces to be coated, *held* unanticipated, valid, and infringed.

**2. Patents ⬤25.**

Where elements of composite structure do not perform joint function so that elimination of one would not impair function or operation of other, there is mere "aggregation," as distinguished from "patentable combination."

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Aggregation; First and Second Series, Patentable Combination.]

**3. Patents ⬤58.**

In patent infringement suit, under Rev. St. § 4921, burden of proving defense of anticipation is on defendants, and every reasonable doubt should be resolved against them (Comp. St. § 9467).

**4. Patents ⬤32.**

Rule of patent office that doubt as to patentability should be resolved in favor of applicant, if it exists, *held* to merit no consideration from courts.

**5. Patents ⬤16.**

Question of invention is one of fact.

**6. Patents ⬤18.**

Fact of invention may be negatived by showing that mechanic skilled in art would see, construct, and apply improvement.

**7. Patents ⬤26(1).**

Selection and regrouping of old elements whereby difficult problem is solved entitles patent claims to liberal construction.

**8. Patents ⬤45.**

On issue whether device is patentable combination, law regards a change as evidence of novelty and its acceptance and utility often as demonstration.

**9. Patents ⬤72.**

Anticipations will not be found in prior devices unless they furnish clear suggestion. of improvement in question.

**10. Patents ⬤62.**

Oral testimony of anticipations must be strongly scrutinized, and be clear, satisfactory, and beyond reasonable doubt.

**11. Patents ⬤112(1)—Patent cannot be attacked collaterally for defense not apparent on its face.**

Patent cannot be attacked collaterally for defense not apparent on its face, and one sued for infringement will not be permitted to set up defense that patent was fraudulently obtained, no fraud appearing on its face.

**12. Patents ⬤168(1)—Unambiguous claims of patent are to be interpreted according to meaning of their own terms, uncontrolled by representations in argument.**

Unambiguous claims of patent are to be interpreted according to meaning of their own terms, not controlled or limited by representations made in argument as to scope of invention or features wherein it differs from prior art.

**13. Patents ⬤316.**

Where presumption of validity of patent is not overcome and infringement is made out, plaintiff suing under Rev. St. § 4921, is entitled to injunction and accounting (Comp. St. § 9467).

In Equity. Separate suits by the Alliance Securities Company against J. A. Mohr & Son and against the Standard Oil Company. Decree for plaintiff.

Affirmed in 14 F.(2d) 799.

Samuel E. Darby and Darby & Darby, all of New York City, and John L. McNab and Byron Coleman, both of San Francisco, Cal., for complainant.

Charles W. Owen and Owen & Owen, all of Toledo, Ohio, and J. J. Lermen, William K. White, and Charles M. Fryer, all of San Francisco, Cal., for defendant J. A. Mohr & Son.

Pillsbury, Madison & Sutro and Felix Smith, all of San Francisco, Cal., for defendant Standard Oil Co.

KERRIGAN, District Judge. These are suits brought under Rev. Stats. § 4921 (Comp. St. § 9467), charging infringement of letters patent of the United States No. 1,196,691, for an invention of means for distributing liquids. The maker and seller, the De Vilbiss Manufacturing Company, has assumed the defense and is the real defendant in each case. Plaintiff is the assignee of Blake F. Hopkins, in whose name the patent originally issued. [27]

The defenses which have been set up are invalidity of patent, by reason of the prior art; prior public use; prior invention; want of invention; and fraud and imposition on the Patent Office, which estop plaintiff to maintain these actions.

The patent in suit is broadly defined as a means for atomizing and spraying liquids, and is specifically stated to be designed particularly for the spraying of liquids on surfaces to be coated. Air under pressure is utilized to discharge and atomize the paint, oil, varnish, or other material being sprayed, and the alleged invention is claimed to reside in *independently* controllable means

which are employed for regulating the pressure of discharge air, both into the paint container and from the discharge nozzle. A closed tank 1 contains the spraying material, and an air line 2–4 leads to its interior, from a source of air pressure supply. A reducing valve 6 is disposed in this line. A material discharge tube 14 leads from the tank to the inner tube of a discharge nozzle, while an air tube 15 leads from the air supply to its outer tube. In the air line 2–15 is a pressure regulator 9. Hand-operated spring or stop valves 16 and 16a are placed in the liquid and air discharge tubes 14 and 15, adjacent to the nozzle, and normally act to close those tubes when the apparatus is not in use.

In customary operation of a spraying device of this character, sufficient air pressure is maintained in the tank to force the liquid to and slowly from the discharge nozzle, and the force of nozzle-discharge of air is regulated to suit the material being sprayed, as well as the fineness or degree of atomization. The pressure in the tank is regulated and maintained substantially constant by reducing valve 6, in the air line to the tank; and pressure of air at the nozzle is regulated by a similar valve 9.

A study of the file proceedings leading up to the issuance of the Hopkins patent indicates that the application, which was filed on October 27, 1913, was subjected to a long prosecution before being allowed. The first action of the examiner was to reject it, saying: "The claims are rejected on Quest (No. 627,877; June 27, 1899), in view of the fact that it would not be considered to involve invention to place a well-known reducer in a paint-spraying machine. Furthermore, the reducer is shown in Fisher (No. 584,864; June 22, 1897)."

An amendment thereupon was filed, and the examiner again rejected the application, saying that "there would be no invention in applying well-known reducer valves wherever required in a paint-spraying apparatus, such as shown in Quest. This would seem to be nothing more than mechanical skill, especially in view of Fisher of record."

A second amendment was filed, and the application thereupon was finally rejected, with the statement that "to use a reducing valve in any of the tubes of Quest's apparatus in place of the hand-operated valves is lacking in patentable novelty." Then followed an addition of claims, and the primary examiner was requested by plaintiff's present attorneys to withdraw his final rejection. In their argument it was stated that the air pressure in the tank must exceed the pressure of air discharge at the nozzle, and that this could not be accomplished by any of the prior art patents. In a supporting affidavit Hopkins said: "Most, in fact all, of the materials in common use for paint require more pressure to raise them to the point of application than it does to atomize them. * * * " Upon reconsideration, the examiner allowed certain claims and rejected others; whereupon appeal was taken to the Board of Examiners in Chief.

In their brief on appeal, counsel made similar representations with regard to the relative pressures of air in the paint tank and in the air lines to the nozzle. The examiners in chief, by a vote of two to one, refused to allow additional claims, and in affirming the rejection said that "in the Fisher patent there is an automatic valve E–4 which determines the air pressure which will be applied to the tank * * * and valves C–4 in both the air and paint pipes by which the pressure at which each is supplied to the atomizer nozzle may be independently regulated."

Thereupon appeal was taken to the Commissioner of Patents, and briefs containing the same arguments were filed, together with another affidavit, to which reference hereinafter will be made. The Commissioner of Patents reversed the decision of the examiners in chief, allowing all the claims, and on August 29, 1916, patent finally issued. [1] To the question of infringement little attention need be given. The spraying apparatus used by defendant, of a type manufactured by the De Vilbiss Manufacturing Company, comprises a closed tank for the liquid to be sprayed, a spray nozzle, air pressure lines to the tank and nozzle, and a liquid line from the one to the other. A double air pressure regulator is mounted on the top of the tank, and is independently operable to regulate the pressure of air entering the tank, as well as that of the air passing to the nozzle. The purpose of mounting these regulators on the tank is to provide them with a single mount, and to increase the convenience of adjustment, as well as of carriage.

Defendants assert that the claims of the Hopkins patent are limited to an independent arrangement of the air regulators, and that if the present tank constitutes an infringement, this could be avoided by arranging the regulators in series; in other words, that by placing reducer 9 between the air supply and reducer 5, so that the air

will pass through both regulators before entering the tank, the claims of Hopkins may be avoided. Passing this interesting but doubtful contention, it is sufficient to say that the defendants' apparatus now before the court contains and employs the combination of elements defined in Hopkins' claims; that those elements have identically the same relation and relative arrangements as there is described; and that his specifications just as aptly apply to the defendants' structure as to that shown in the drawings of the Hopkins patent. A rearrangement of valves has been made, it is true, but without the accomplishment of a new result. An infringement therefore is clearly made out.

Turning to the prior art, it is important to determine the nature of this alleged invention. An analysis of claim 1 shows that it is for a *combination* of the following elements: (1) A closed liquid receptacle, or tank; (2) a spray nozzle, with inner and outer discharge members; (3) a liquid conduit *12–13–14–16–17* from the tank to one of the members of the nozzle; (4) a compressed air supply conduit *2*; (5) branch pipes *4* and *5* connected therewith, leading respectively to the tank and to the other nozzle member; (6) independently controllable reducing means *6* and *9*, interposed in these branch air pipes, permitting variation of the pressure in either without affecting that in the other. Plaintiff asserts, as indeed it must, that if any one of these elements were removed, without its replacement by something equivalent in purpose and function, the usefulness of its entire structure would be destroyed, and makes a similar contention with regard to each of the other claims. The central thought running through all of them is the supplying of atomizing air and liquid to a stray nozzle, the latter by pressure applied to the liquid itself, and the former by connection with an air compressor; both pressures being under independent and relatively variable control, so as to be maintained at constant, uniform values and ratios. This concept, the defendants maintain, because all of its elements are old, does not amount to invention.

[2] What is aggregation, and what is patentable combination, are old and certainly most vexed questions. Where the elements of a composite structure do not perform a joint function, as is the case where a rubber eraser is united to one end of a lead pencil, we have a case of aggregation. Reck-

endorfer v. Faber, 92 U. S. 357, 23 L. Ed. 719. The elements of lead and rubber do not co-operate with each other, or mutually contribute to the desired result, and the omission or elimination of one of them in no way would impair the function or operation of the other. The often quoted rule of Pickering v. McCullough, 104 U. S. 310, 318 (26 L. Ed. 749), requires that a combination "form either a new machine of a distinct character and function, or produce a result due to the joint and co-operating action of all the elements, and which is not the mere adding together of separate contributions," before it will be held to constitute an invention.

That these tests are met in the instant case seems to me quite plain. As will be shown, infra, a great improvement has been made in the paint-spraying art by the combination of elements described, and the result so obtained would be impaired, if not destroyed, by the omission of any one of them. However, it must be, and I think is admitted, that no single element of the Hopkins patent is new. Its only substantial difference from Fisher, as was repeatedly pointed out in the Hopkins file proceedings, is the provision of an automatic pressure regulator, *9*, in the air line leading to the discharge nozzle, in addition to and supplementing the hand-controlled plunger valve *16a* which already was to be found there. Automatic reducer valves of the type in question were old and well known in 1913, and were commonly used in gas, air, steam, oil, and other fluid lines. As a matter of fact, there was an automatic valve *E–4* on the air line to Fisher's tank. The question presented therefore must be phrased thus: Did it amount to an exercise of the inventive faculty to conceive the idea (and means for carrying it out) of independently controlling the two pressures, and to make this relatively simple change in a pre-existing machine? In other words, must the Hopkins patent be held void for lack of novelty? [3] In this connection it is necessary to determine the kind and nature of proof which must be made, in order to establish invalidity upon this ground. It seems that the authorities are uniformly to the effect that the burden is upon defendants to establish the defense of anticipation, and that "every reasonable doubt should be resolved against him." San Francisco Cornice Co. v. Beyrle (C. C. A. 9) 195 F. 516, 518, 115 C. C. A. 426, 428; Schumacher et al. v. Buttonlath Mfg. Co. (C. C. A. 9) 292 F. 522, 531, and

numerous cases cited. . In as clear and emphatic language as may possibly be used, the supreme and circuit courts repeatedly have affirmed this rule, and without exception have required the same degree of proof as would be necessary if the life or liberty of the patentee himself depended upon the novelty of his invention. Moreover, this is not a harsh nor arbitrary rule of construction, but, on the contrary, one which is reasonable and beneficial, in accord with principles of common justice governing situations of this kind. The plaintiff has disclosed to the world a device which by its use the defendants acknowledge to be useful. The experts of the Patent Office, after the most careful consideration, have pronounced it new. Under these conditions, the law properly requires that all doubts as to the correctness of their action be removed before it will permit a court to say that a patentee has not an exclusive right to his own disclosure.

The patents on which reliance was chiefly made, in order to establish anticipation (Fisher, supra; Quest, supra), were cited by the examiner in the Patent Office, and received full consideration there. The proceedings, as was stated by Judge Morrow in San Francisco Cornice Co. v. Beyrle, supra, of themselves raise a presumption in favor of this patent's claims.

[4] Defendants reply that there is a Patent Office rule that where a doubt as to patentability exists, it should be resolved in favor of the applicant and the patent granted, so that if the patentee's rights are contested the matter may be taken into court and there determined upon full proof. In other words, it is asserted, that where a *doubt* exists, it is to be resolved by placing the applicant in a position from which he can be dislodged only by proof of a character sufficient to convict of felony, where every reasonable doubt must be resolved in his favor. Such a rule, if it exists, merits no consideration from the courts.

[5-7] The question of invention is universally held to be one of fact. Where comparatively simple changes in existing apparatus are made, the test often applied is, Would such a change "naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures?" Atlantic Works v. Brady, 107 U. S. 192, 200, 2 S. Ct. 225, 231 (27 L. Ed. 438). Not all improvements are inventions, and the fact of invention may be negatived by proof that the way to them was

open, "made so clear that the ordinary mechanic skilled in the art would see and construct and apply." Slote & Co. v. Stratton Co. (C. C.) 159 F. 485, 491. But even though all of the elements of a disclosure are old in the art, the selection and regrouping of them, whereby a difficult problem, which others have failed to solve, is finally brought to solution, entitles the patent claims to as liberal a construction as the prior state of the art will permit. Frederick Iron & Steel Co. v. Sanford Riley Stoker Co. (C. C. A. 4), 287 F. 495, 500. And invention cannot be denied solely because it is possible to select from prior patents the several elements which have been united by what, *after* the combination is known, appears to have required only mechanical skill. Krauth v. Autographic Register Co. (D. C.) 285 F. 199, 205, and cases cited.

"In administering the patent law," said Chief Justice Taft in the recent case of Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 328 (67 L. Ed. 523), "the court first looks into the art to find what the real merit of the alleged discovery or invention is and whether it has advanced the art substantially." As said by the Circuit Court of Appeals of the Second Circuit, "The principal question in such cases is: Has the patentee added anything of value to the sum of human knowledge; has he made the world's work easier, cheaper and safer; would the return to the prior art be a retrogression? * * * Where the court has to deal with a device which has achieved undisputed success and accomplishes a result never obtained before, which is new, useful and in large demand, it is generally safe to conclude, that the man who made it is an inventor. * * * The keynote of all the decisions is the extent of the benefit conferred upon mankind." O'Rourke Engineering Co. v. McMullen (C. C. A. 2) 160 F. 933, 938, 88 C. C. A. 115, 120; Boyce v. Pyrene Mfg. Co. (D. C.) 290 F. 998, 1004. Judged by these tests, there is, to say the least, a reasonable doubt that the Hopkins patent lacks the quality of novelty and is void for want of invention.

The record made by its apparatus, in the painting of Exposition Building in San Francisco in 1915, covering an area of 1,500,000 square yards of surface in 40 working days with 18 men—an undertaking which it would have required the same number of men three years to accomplish with handbrushes, and which with sprayers of the

cup or gravity type scarcely could have been accomplished at all—is an attest of the value and importance to the paint-spraying art of a sprayer which, through flexibility of regulation, is instantly adaptable to all variations of conditions encountered in practice. So, too, is that made in painting the interior of the central nave of the San Francisco Ferry building, which was done by use of the Hopkins apparatus, without interfering with a daily traffic of 50,000 persons, and without the protection of coverings.

These instances evidence important, substantial, and valuable advantages over what preceded Hopkins in the art—advantages which exist in addition to a wide extension in the range of use of apparatus for spraying liquids. "In such cases," says Judge Learned Hand, "the history of the art furnishes good evidence that the change is an invention." Lane v. Craftsmen Film Laboratories (C. C. A. 2) 7 F.(2d) 288, 289.

Defendants vigorously maintain that similar results may be obtained by use of the Fisher spraying machine, exactly "as is," and that no improvement over its functions has been achieved. In doing so they render inexplicable their presence before this court and their attack upon the Hopkins patent. Fisher's monopoly has long since expired, and his device belongs to the public. It is very much cheaper to fit sprayers with needle valves, such as Fisher's valve 6, than with automatic reducers; yet in the De Vilbiss apparatus, which has been sold to defendants and to others in the trade, reducers have been used. Why, if Fisher is adequate, these suits have been contested, can be explained only on the hypothesis that defendants believe there is something of value in Hopkins which Fisher does not possess.

A new combination of old elements, as we have seen, may constitute a patentable combination. It is only necessary that such arrangement attains new and useful results, or produces old results more effectively, in a marked and obvious degree, being for that reason accepted by the public as an improvement on what has been used before. Parsons v. Minneapolis Threshing Co. (C. C.) 106 F. 941, 942; Consolidated Rubber Tire Co. v. Finley Rubber Tire Co. (C. C.) 116 F. 629, 634. The Hopkins machine, unlike its predecessors, can be used under almost any conditions, with any kind, quality, density, weight, or gravity of material, at any practical height of application, with any desired capacity of tank or width of spray, and still with absolute uniformity in atomization of material and uniform application to the surface to be covered, whatever its shape or nature. These results, which are not to be had by use of other machines, are attained by the independent regulation of reducing valves 6 and 9, by which constant pressures, variable at the will of the operator, are independently maintained.

[8] But defendants argue that the valves C and E–4 of Fisher are identical with those valves, except that in Fisher the valve C is of the needle or plunger type, and manually adjusted instead of automatic; that the only improvement of Hopkins consists in substituting an old means for automatic regulation, for a pressure-regulator of the manual type; and that the results of both are identical. In the first place, the point is again to be noticed that reducer 9 has been added to Fisher, and not substituted for air valve C. Secondly, it appears from the evidence that defendants' contentions with regard to the identity of effect of these valves are not founded in fact. Needle valves are, it is true, reducers of air pressure, but they reduce it only through a reduction of volume. The air valve C of Fisher, like the paint valve C, operates primarily to regulate flow quantity, which in the Hopkins sprayer may be varied without variations in pressure, and entirely distinct from pressure. When functioning properly, a pressure-reducing valve is opening and closing automatically and constantly, to maintain constant delivery pressure, while the quantity of flow of air remains undisturbed. This is done by Hopkins' valve 9. On the other hand, by regulation of valve 16a the quantity of flow can be varied at will, without affecting the pressure of discharge in the slightest degree.

Whether due to the necessity of automatic adjustment of pressure, or whether to the need of its separate control, independent of flow, or the reverse, or whether the fact that regulation of Fisher's valves E–4, C, and C, as suggested by the affidavit of the valve expert, Mr. Acton, can be only essentially dependent, it seems reasonably clear that the Hopkins apparatus attains a degree of regulability of flow of liquor, and of flow as well as of pressure of air, which with Fisher is impossible, and which the varying circumstances of work render highly advantageous. The simplicity of the means employed is not conclusive, and should not blind the court to its real character. The decisive answer to defendants'

contentions here is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before. Potts v. Creager, 155 U. S. 597, 608, 15 S. Ct. 194, 39 L. Ed. 275. Many things seem obvious after they have been done, which for years have escaped the search of experts, and knowledge gathered after an event invariably brings with it an underestimation of the difficulties which it has overcome. For this reason the law regards a change as evidence of novelty, and its acceptance and utility often as demonstration. Pearl v. Ocean Mills et al., 2 Barn. & A. 469, 19 Fed. Cas. p. 56, No. 10,876; Boyce v. Pyrene Mfg. Co. (D. C.) 290 F. 998, 1003. The merit of such inventions lies rather in the end reached than in the means employed. Indiana Novelty Mfg. Co. v. Crocker Chair Co. (C. C. A. 7) 103 F. 496, 501, 43 C. C. A. 287.

It is in this connection that several of the cases cited by defendants may be distinguished. In Blake v. San Francisco, 113 U. S. 679, 5 S. Ct. 692, 28 L. Ed. 1070, where the alleged invention consisted in substituting an automatic pressure relief valve for a hand-controlled valve in a fire hose, to prevent bursting under excessive pressure, the substitution not only was obvious, but accomplished a result in no way different from that obtained by use of a hand valve. As the Supreme Court said, some further effect than mere relief of pressure must be obtained; an effect which in the present case is a tremendous increase in utility.

[9] Royer v. Roth, 132 U. S. 201, 10 S. Ct. 58, 33 L. Ed. 322, in which the alleged inventive act consisted in substituting an automatic for a hand-reversing device in a rawhide fulling machine, rests on similar principles, as do other of the cases cited.

Referring more specifically to the patents which have been set up to show anticipation: Fisher, supra, and Quest, supra, both of which are for paint-spraying apparatus, already have been disposed of. As for the others, although in some of them an independent regulation of pressure on two fluid materials is effected by the use of independently adjustable reducing valves (Collings & Weatherhead, No. 412,875; Hull, No. 635,071), the arts (oilburner, etc.), are only remotely analogous, and transposition would require the substitution of tubes for pipes, together with other alterations. The rule has been correctly stated in 20 R. C. L. that: "Anticipations will not be found in prior devices in the art to which a patent belongs unless they are of such a character as to have furnished clear, if not unmistakable, suggestion of the improvement in question, and if the anticipation suggested comes from another art, it is of less importance." 20 R. C. L. 1147; Topliff v. Topliff, 145 U. S. 156, 161, 12 S. Ct. 825, 36 L. Ed. 658; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 422, 22 S. Ct. 698, 46 L. Ed. 968. Following it as thus laid down, I hold that the defendants have failed to establish the invalidity of plaintiff's patent by reason of the prior art.

[10] The defenses of prior invention and prior public use have been set up and supported by extensive testimony. Here again defendants are required to meet the burden of proving the anticipations alleged, and, since the evidence relied on consists only of oral testimony, their proof must be strongly scrutinized, and to be acceptable must be clear, satisfactory, and beyond a reasonable doubt. 20 R. C. L. 1171; The Barbed Wire Patent, 143 U. S. 275, 285, 12 S. Ct. 443, 36 L. Ed. 154; Peelle Co. v. Rashkin Co. (C. C. A. 2) 222 F. 293, 297, 138 C. C. A. 19. Without going into this evidence in detail, it is sufficient to say that I regard it as far from convincing. The case of Parker v. Stebler et al. (C. C. A. 9) 177 F. 210, 213, 101 C. C. A. 380, is so closely analogous as to be decisive of these points.

[11] Finally, it is contended that in the proceedings before the examiners of patents and before the commissioner Hopkins repeatedly made untrue statements as to the necessity of maintaining a pressure in the tank which exceeded that at the nozzle of a paint sprayer. I find as a fact that except when spraying at unusual heights (40 feet or more above the paint tank), it usually is necessary to maintain an atomizing pressure not less than, but in excess of, that in the tank. However, it is by no means certain that had this fact been brought to the attention of the examiners their action would have been different. Furthermore, it is an established general rule that a patent can be attacked for defense, not apparent on its face, only by regular proceedings instituted for that purpose, and not collaterally. A person sued for infringement will not be permitted to set up as a defense that the patent was fraudulently obtained, no fraud appearing on its face. 20 R. C. L. 1172; Philadelphia, etc., Railway Co. v. Dubois, 12 Wall. 47, 64, 20 L. Ed. 265. Much time and effort nevertheless have been expended in an effort to show limitations upon

the scope of the Hopkins grant, by reason of the statements above referred to.

[12] In the light of numerous authorities upon the subject (Fullerton Walnut Growers' Association v. Anderson-Barngrover Mfg. Co. [C. C. A. 9] 166 F. 443, 452, 92 C. C. A. 295; Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 227, 26 L. Ed. 149; Campbell Metal Window Co. v. Pomeroy & Co. [D. C.] 300 F. 872, 874), it is clear that the unambiguous claims of a patent are to be interpreted according to the meaning of their own terms, and are not to be controlled or limited by any representation made in argument as to the scope of the invention or the features wherein it differs from the prior art.

In Campbell Metal Window Co. v. Pomeroy & Co., supra, it was so held, the court saying: "I do not understand that this case [Goodyear Dental Vulcanite Co. v. Davis, supra, 102 U. S. 222, 26 L. Ed. 149], meant to require me to go through all that was said in the endless communications between applicant and examiners to gather piecemeal the intent of the grant, as though I were construing a correspondence. If so, what is the purpose of the final formal instrument? * * * In any event, it is well settled * * * that * * * we do not look to such exterior expression of intent, but treat a patent as we should a will, a deed, or any other instrument intended to be a final memorial of the parties' intention [citing cases]." I see no escape from this reasoning.

The other contentions made by defendants do not merit discussion.

[13] Since the presumption of validity, which upon its issuance attached to plaintiff's patent, has not been overcome, and an infringement having been made out, it follows that plaintiff is entitled to an injunction in each of these cases, as prayed, and to an accounting. It is therefore ordered that decrees be prepared in favor of the plaintiff, with costs, and that the matters be referred to Commissioner Krull for ascertainment of damages.